IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**MOTANGA E. OBIA,**
3929 Lumo Circle
Baltimore, M.D. 21133

                        **Plaintiff,**

V.

<u>Defendants</u>

**J.P. Morgan Chase & Co.**
601 Pennsylvania Ave N.W.
Washington D.C. 20002

**Jamie Diamond**
**Peter L. Scher**

**The Carlyle Group**
1001 Pennsylvania Ave NW
Washington, D.C.  20004

**David Rubenstein**

**COMPLAINT AND JURY DEMAND**

Case: 1:19–cv–02340   JURY DEMAND
Assigned To : Unassigned
Assign. Date : 8/2/2019
Description: Employ. Discrim. (H–DECK)

### I. NATURE OF ACTION

Plaintiff Motanga E. Obia (hereinafter, "Plaintiff" or "Plaintiff") brings this action against his former

employer, J.P. Morgan Chase Bank, (hereinafter, "Defendants willful violations under **Washington**

**D.C. Human Rights Act 1977,** 2-1403.16, **The Americans with Disabilities Act ("ADA")**, 42 U.S.C.

§ 12101 et seq.; **Title VII Civil Right Act 1964** 42 U.S.C. 2000e – 5(g), **Equal Pay Act** 29 U.S.C. 206

**(d)(1)**, **Unfair Trade Practices** 28-3904 and a **Tortuous Interference Claim.** Plaintiff continue by

alleging that each Defendant J.P. Morgan Chase & Co. and The Carlyle Group unlawfully

discriminated against him on the basis of Race, Disability, National Origin, Personal Appearance and

Credit Information. Plaintiff further alleges that J.P. Morgan Chase & Co. business practices and

decisions presented a Disparate Impact. Plaintiff seeks to recover all lost wages, salary, employment

benefits, and any other compensation denied or lost due to J.P. Morgan's willful and intentional

violations of local and federal law; pre- and post-judgment interest, compensatory damages,

consequential damages, punitive damages, attorneys' fees, costs, and appropriate injunctive and

equitable relief.

1

## II. JURISDICTION

1.      This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendant because it is an agency of the District of Columbia government and Defendant's actions and omissions alleged herein occurred in the District of Columbia. ☐

2.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in the District of Columbia and because at all relevant times, Defendant was doing business in the District of Columbia.

**3.** Plaintiffs' state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

## III. INVOCATION OF ADMINISTRATIVE REMEDIES

4.      Plaintiff filed a timely charge of discrimination with the District of Columbia Office of Human Rights ("DCOHR") on **August 4, 2017** and requested a withdrawal of from The Office of Human Rights in Washington D.C. to pursue this case in a different form.

5.      Plaintiff seeks to have claims removed from OHR pending investigation states as Plaintiff's DCFMLA claims statute of limitation tolls while pending investigation in accordance to DCMR 4-1610.3 and Plaintiff's claims under DCHRA also toll in accordance to DC Code 2103.16 (a). in accordance to DCHRA requires that the charge be withdrawn before Plaintiff my make filing a complaint in court.

6.      DCOHR is a Fair Employment Practices Agency (FEPA) with which the Equal Employment Opportunity Commission ("EEOC") has a work sharing agreement. Consequently, Plaintiff's charge was automatically cross-filed with the EEOC upon filing with DCOHR and withdrawn from the EEOC and receiving a *Notice of Right to Sue* from the EEOC on **May 8, 2019** for claims associated with The Civil Rights Act of 1964 and The Americans with Disability Act 1990.

## IV. THE PARTIES

7.      Plaintiff is 34-year-old African American male who was previously employed by J.P. Morgan & Co and hired for the position of Relationship Sales Officer – Associate from March 28, 2016 through July

14, 2017.

8.        J.P. Morgan terminated Plaintiff upon him partially returning to work from fully protected leave under the Washington D.C. FMLA Provision. Plaintiff was at all relevant times an eligible employee of various protected characteristics in accordance to local and federal statutes.

9.        All defendant are associated to publicly traded companies and maintains offices in New York, New York with a regional presences in Washington, D.C. area that employs more than fifty (50) employees in the District of Columbia with a principal place of business in Washington D.C.

10.        J.P. Morgan Co. is publicly traded company whose office is in Washington, D.C. complies with local and federal statutes and in accordance to Public Policy **Jamie Diamond & Peter Scher.**

11.        The Carlyle Group is publicly traded company whose office is in Washington, D.C. complies with local and federal statutes and in accordance to Public Policy **David Rubenstein.**

12.        ☐ Plaintiff's primary responsibility in this position was to identify, plan and implement strategies for client growth, cross sells and retention.

13.        As part of this role, J.P. Morgan asked that Plaintiff cultivate strong relationships with clients across all portfolios and internal partners to resolve product and service issues. The incumbent in this position will have to demonstrate proficiency in account management, an ability to translate customer issues into solutions, and a full knowledge of the product line and its applications or relevant experience in other lines of business along with clear leadership success.

### V. FACTS

14.        Plaintiff is 34-year-old African American male who was previously employed by J.P. Morgan & Co and hired for the position of Relationship Sales Officer – Associate from March 28, 2016. J.P. Morgan's Federal Government Group in Washington D.C. predominantly has been a Commercial Card Group with a Treasury Payments component.

15.        The Plaintiff primarily covered the Department of Homeland Security Commercial Card Travel Program (GSA SmartPay Program), the Department of Defense NAFI Program (Non - GSA SmartPay Program). Plaintiff continues by referencing that the organization was going-through an internal re-organization and due to the organization unwillingness re-bid after a **April 18, 2016** call with Leadership

and internal partners on the GSA SmartPay Commercial Card Program, which was a substantial percentage of the groups revenue.

16.     On **June 7, 2016** in Rochester, New York, a meeting was held "*Defining Roles & Responsibilities*" and Dan Anderson – **Senior Sales Associate** referenced that the Plaintiff portfolio had been originally been covered by "*two individuals*" and the Plaintiff managed the largest portfolio with-in the group.

17.     On June 30, 2016, Richard Haug sent an email at 3:02 P.M. concerning the Plaintiff performance at a client meeting with the Department of the Air Force in San Antonio, Texas. Mr. Haug continued by referencing that due to the Plaintiff's efforts, the client would be supportive to elevating the Banks efforts to the "***Pentagon***" and how the Plaintiff was instrumental with engaging the client to that point. Cedric Henson, Steven Patron & Doug Ray – **Department of the Air Force Contracting Team** referenced the need to have a report amended to support his internal team's efforts with extracting data for their own internal reporting efforts. They referenced that this was a practice that was conducted in the past and would like to repeat this practice. Plaintiff coordinated efforts with internal colleagues once he returned to Washington D.C. and was able to obtain the approvals from Betsy Stahl – **Assistant General Counsel** on **July 25, 2016** at 4:11 P.M. for the Internal Reports conversation.

18.     On **July 28, 2016,** Plaintiff referenced to several J.P. Morgan Executives an accounting discrepancy. Plaintiff continued to inform J.P. Morgan that this is something that should be corrected internally to the appropriate Executives. When the Plaintiff referenced the *accounting discrepancy*, Mr. Haug referenced that the internal reported data was being reflected incorrectly on a quarterly basis from the reporting team and that the Plaintiff should make manual corrections. Richard continued the conversation by referencing that the Federal Government reports on a **Fiscal Year** and J.P. Morgan Chase reports on a **Calendar Year** and it wouldn't be expected for the client to follow the firm governance policies pertaining to reporting. Plaintiff continues by referencing that the Defendant was intentionally negligent, as the alleged issue was something that was brought to the attention of management and had the insight to the on-going issue and the impact to the Enterprise and its performance matrix.

> A.   *Omissions to internal and external performance matrix.*
>
> B.   *Impact to Tax & Compliance Obligations*
>
> C.   *Impact to past and present leadership bonus's*

D.    Over-Billing **(Credit Card Fee's)** *the Government*

*19.*    Richard Haug was abusive towards the Plaintiff and threatening when the Plaintiff re-addressed the error and also referenced that the Plaintiff didn't understand and continued *"he was aware of the Plaintiff's career aspirations and that if the Plaintiff did not comply, he would be a professional hindrance to the Plaintiff's career and that the Plaintiff was brought-in to bring-in business unlike his peers".* When the Plaintiff asked Keith Kadish to address the alleged bookkeeping issue, he referenced to *"not be brought into the matter".*



20.    Plaintiff would later reference this communication to management following the heated meeting with Richard Haug & Keith Kadish on July 28, 2016. Plaintiff continues by referencing that Chamaye Smith - **Administrative Assistant to Eva Robinson** also referenced concern about the meeting to Eva Robinson due to the Plaintiff's emotional state post the interaction with the two Executives on **July 28, 2016.** Plaintiff later met with Eva Robinson concerning the interaction with Richard Haug and Keith Kadish and addressed the un-pleasant communication with the Executives. Plaintiff continues by referencing that management was aware of the accounting discrepancy and should have known about the error prior to the Plaintiff's notification and its impact to internal and external performance. Plaintiff was later advised to make the *manual* corrections by Eva Robinson with the support & guidance of Keith Kadish.

21.    Additionally, Plaintiff continues by referencing that somewhere post the Plaintiff's communication with Eva Robinson, Richard Haug and Keith Kadish concerning the accounting error, further communication was had between management – Eva Robinson and Leon Rock Jr. - *Business Analytics Executive* team concerning circumventing the Finance Teams formatted protections. Eva Robinson would later have internal conversations with the Business Analytics team concerning the alleged

discrepancies & contractual disputes, but nothing "*criminal or nefarious*" was shared with the Plaintiff pertaining those communication. Plaintiff continues that the Executives engaged a shredding exercise "*cabinet cleanup*" of allegedly seasoned documents pertaining to the client *(Department of Defense)* allegedly other client data. This exercise was led by Keith Kadish and aided by Donald Giordano, Christopher Conway, as the Plaintiff unveiled himself of this exercise due to other obligations.

22.      During the fourth week in third quarter of 2016, plaintiff met David Rubinstein from the Carlyle Group while the Plaintiff was at Cosi restaurant on 10th Ave in Washington D.C. During the conversation, Mr. David Rubenstein referenced that the Plaintiff reach out to MaryPat Decker - **Administrative Assistant**. Plaintiff alleges that through a series of communication that were made (i.e. **September 12, 2016** at 12:57 P.M. & **October 13, 2016** at 12:32 P.M.) somewhere around this interaction with Mr. Rubenstein, the Plaintiff became the attention of Senior Executives within J.P. Morgan Chase & Co. and that this communication would encourage the enterprise to allow the mis-treatment of the Plaintiff due to the visibility of Mr. Rubenstein to the Enterprise. Plaintiff alleges that Mr. Rubenstein would have made his initial first-call to J.P. Morgan's CEO to inquiry about the Plaintiff and from there would have expose the Plaintiff to leadership in a negative manner and then by referencing that Jamie Diamond would then make his first-call to his Regional Executive - *Peter Sher* - Head of Corporate Social Responsibility" to single-out the Plaintiff and encourage the Plaintiff's discharge somewhere around the initial communication with Mr. David Rubenstein, through the management of Eva Robinson & Andrew T. Smith (*Plaintiff's First & Second-line Managers*).

23.      Plaintiff continues by referencing that in or around the third quarter of 2016, the enterprise began to encourage the harassment towards the Plaintiff excessive reticule of the Plaintiff and then creating an intolerable working environment. Plaintiff continues by referencing that Eva Robinson would intentionally "***coach***" the Executives - *Richard Haug & Greg Hoger* in drafting disciplinary communication in real-time by going into a conference-room aiding in the formation of the written communication, while also incentivizing theses Executives and other similar situated Executives who performed these tasks on behalf of the Enterprise at Ms. Robinson's direction.

24.      Plaintiff continues by referencing that on August of 2016, another event occurred that was brought to Ms. Robinson's attention through the interaction with Richard Haug. Mr. Haug references that

post a client meeting, Mr. Haug engaged in abusive conduct towards the Plaintiff and became "*aggressive, abusive and reckless*" driving back to the office from a client meeting with the Marines Corps Community Services in Quantico, Virginia and the Plaintiff told Richard Haug to **slow-down**! This communication was then referenced to Eva Robinson and she referenced that the matter would be addressed. Richard Haug would later resign from the group, but remain on the books for extended period of time.

25.    Plaintiff alleges that management instructed lower-level managers to engage in oppressive behavior with the intent to make the Plaintiff's work conditions un-tolerable and in the course of doing – so, it would aggravate the Plaintiff's stress levels and disability. Plaintiff continues by referencing that during one meeting with Ms. Robinson, she advised that the Plaintiff "*should quit*" when the Plaintiff referenced that he would like to transfer away from the group, which is communication that the Plaintiff had echoed across the organization to several Senior, and mid-level Executives. Plaintiff continues by referencing that Ms. Robinson was egregiously empowered to engage in this reckless form of retaliation against the Plaintiff and even through all the communications that were made to Human Resources and Employee Relations, Plaintiff continues by referencing that she was "*incentivized"* through a side agreement & un-fair practices because the Enterprise had knowledge of should have had knowledge of the conduct and that the communication disbursed by John Donnelly during the week of **July 10, 2017**, which was the Plaintiff discharge-week.

26.    Plaintiff continues by referencing that Ms. Robinson was in-bolden by the enterprise and that she continued her discriminatory conduct and pervasive harassment against the Plaintiff by referencing to the Plaintiff during the first quarter of 2017, ***"You can't Win"*** in her attempt to find a rationale to discharge the Plaintiff by *sabotaging* the Plaintiff's performance through a performance improvement Plan and through the direction of the Leadership chain and allegedly through the aid of external parties, hence exposing the enterprise to breaches of their fiduciary obligation to shareholders and potential data breaches, intellectual property theft and other regulatory risk in connection to the reckless conduct.

27.    Plaintiff made several communications to Human Resources concerning wanting to transition away from the group and through those communications between Ms. Patricia David, Plaintiff interest in wanting to connect with other managers in the New York office and she helped to introduce the Plaintiff to Lester Owens – **Global Head of Banking Operation &** Rodney Miller Sr. **Vice Chairman of**

**Mergers & Acquisition.** Through those connections, Plaintiff made _clear_ communication the interest to depart from Washington D.C. and during the communication, Plaintiff was advised to obtain counsel as it was still un-clear the direct motivation of the harassment and sequentially made communication with several executives within J.P. Morgan Chase & Co. about transferring away from the organization.

**[Diagram 1.1a]**



28.

During the fourth quarter of 2016, Plaintiff's medical condition began to worsen and had taken several days away from the office because of his medical condition. Plaintiff was advised by Eva Robinson to speak with J.P. Morgan's internal medical division and seek an accommodation and how this department can help an employee maintain their employment. Plaintiff further references that the manager was aware that the Plaintiff had taken a lot of time away from the office, due to being ill and advised the plaintiff to speak with the medical staff.

29.       On **December 2, 2016**, Plaintiff met with Valarie Rainford - **Head of Advancing Black Leaders** [1.1b (q)], and mentioned the need to transition from current group and mentioned the internal issues within the group. Valarie Rainford mentioned that she would look into the matter, but advised that she would be limited to what she could do to intervene. During the meeting, the Plaintiff began to have an episode (_slurred speech_) and became more and more concern of addressing his health and attempting to leave the organization. Valarie Rainford continued by referencing that the Plaintiff reminded her of her mentee Seekou Kaaland – Managing Director Corporate and Investment Banking Division. Plaintiff later received communication from Mr. Kaaland referencing that the Plaintiff's interaction with Ms. Rainford. Plaintiff alleges that Valarie Rainford was aware of the "_scheme_" to push the Plaintiff out of the firm due to the un-co-operative communication from Mr. Kaaland concerning the Plaintiff's interaction with his mentor   Valarie Rainford - **Head of Advancing Black Leaders.**

30.     On **December 2, 2016**, Plaintiff also took the opportunity to speak with Larry Pryor – **MD of Banking Operations** [1.1 a (b)], who the plaintiff was in contact with pertaining opportunities within his group and who referenced that the plaintiff was being pushed - out of the firm as he was aware of the "*scheme*". Additionally, Plaintiff was advised by a Human Resources Executive Patricia David to address the internal conduct with Employee Relations on **December 2, 2016**.

31.     Plaintiff initially engaged Employee Relations on **December 22, 2016** to address discriminatory conduct and had additional substantive conversations on **January 3rd, 2017, January 5, 2017, January 11, 2017**, Plaintiff and J.P. Morgan employee, Miriam Del Cruz - **Employee Relations VP** [1.1c (v)], subsequently engaged in follow-up conversation about the facts to the investigation and its process. Plaintiff continues at this point; Employee Relations had the opportunity conduct a thorough analysis of the harassers and aid the Plaintiff in "*transitioning away*" from the hostile work environment. J.P. Morgan's Internal Registered Nurse, Penny Inker provided her approval and then requested an additional approval from the manager Eva Robinson on **January 9, 2017 at 3:12 p.m.** due to the Plaintiff's medical condition from the pervasive harassment.

32.     Plaintiff continues by referencing that the Respondent continued to engage in retaliation against the Plaintiff by denying the Plaintiff an internally approved medical accommodation by J.P. Morgan's internal medical staff, which caused no undue hardship to J.P. Morgan, in retaliation for engaging Employee Relations and HR. Plaintiff requested an additional accommodation and this was addressed to Employee Relations and management. Miriam De Cruz stated that management had advised that they were not willing to provide an approval for an accommodation. Plaintiff was later advised by Penny Inker – **Internal Registered Nurse** to seek short-term medical leave from Disability Management Team, post the retaliatory denial by the Defendant.

33.     Additionally, the communication Plaintiff made communication to Eva Robinson's manager, Andre T. Smith over several occasions and through those communication, he was extremely aware of the intentional discriminatory conduct that the Plaintiff was being subjected to the frequent, pervasive and humiliating harassing conduct that was being encouraged by the Enterprise because of David Rubenstein communication with Senior Leaderships. Plaintiff continues that his communication would be escalated to Andrew T. Smith's manager Richard Stephens –**Managing Director** [1.1d (b)] and referenced his interest

in the Washington D.C. group of Associates and then referenced a future training program, which would be held in June of 2017. Richard Stephens – **Managing Director,** continued by referencing that if an older or more experienced employee had more skill-sets; they would be given more responsibility. Richard also referenced that the organization also offered Credit Banking Training and it would be a good skill to obtain and take it somewhere else he should take the "*skill-set and move-on*". Plaintiff continues by alleging that Richard Stephens had received communication from his subordinates concerning the Plaintiff's communication to Employee Relations and would have been aware of the full complaint and was a part of the "*scheme*" to push the Plaintiff out of the organization and due to David Rubenstein and which this communication had been communicated by other Executives outside the Plaintiff's primary employer.

34.     Plaintiff spoke to Miriam Del Cruz about racial discrimination by a J.P. Morgan executive, Dillon Boyer (*Caucasian male*) - Vice President, where on **April 19, 2016**, Dillon Boyer approached Plaintiff's cubical and publicly referred to Plaintiff as a ***"terrorist and drug dealer" because*** Plaintiff had two cellphones on his desk. Plaintiff advised Mr. Boyer to not speak to Plaintiff in that manner in front of his colleagues. Plaintiff was advised by other member of the team Catherine Ramm, Vice President, and Mary Nord, Vice President, and Catherine Ramm advised that Mr. Boyer is known for inappropriate comments and that he should be ignored. Mr. Boyer would be placed under a **training program.**

35.     Miriam Del Cruz continued her investigation concerning allegations of unsafe work environment and workplace safety issue, which would also bring to rise a violation in accordance to Miriam Del Cruz's investigation and the Executive (*Caucasian male*) would be placed under a **training program.**

36.     Plaintiff also made additional communication to Miriam De La Cruz that his role was miss-classified and that his predecessors were all Vice Presidents and notation to management was made about this month ago due to the fact that he was working in a Sales Associate capacity. Plaintiff also continued by addressing that his compensation was drastically below market level by approximately $40,000.00. Miriam De La Cruz would later receive a confirmation from the manager that the job paid $125,000 which is not consistent to what was communicated to the Plaintiff from Dawn Holder – **HR Recruiter** on **March 9, 2016**. Ms. Holder referenced that the communication from Andrew T. Smith *(one level manager above Eva Robinson)* that the opportunity paid $85,000 after obtaining a copy of the Plaintiff's pervious

compensation information, at her request, even though the plaintiff continued to reference that the competitive rate for the opportunity was $125,000 as confirmed by Eva Robinson to Miriam De La Cruz during the first quarter of 2017.

37.     Plaintiff continued the communication with Miriam Del Cruz concerning the accounting discrepancy and she later received communication from management that there was a discrepancy and management referenced the matter to be the *"normalization of the numbers"* on **January 11, 2017** and that the Plaintiff should no longer be working on the book of business, but *never* referenced or confirmed if what the Plaintiff identified as an accounting error was material, as this is something that the Plaintiff had - no insight into due to the report generation process.

38.     Plaintiff continues by alleging that the Respondent was fully aware that the Plaintiff's communication pertaining the **July 28, 2016** meeting had qualified as whistleblowing activity and that all retaliatory conduct would be made by those who were directly or in-directly reporting to her with the intent to circumvent direct retaliatory exposure from the Plaintiff, while still subjecting the Plaintiff to harassment at the encouragement of mixed motives. Plaintiff continues by referencing that he was placed on a Performance Improvement Plan that was supposed to *allegedly* correct the Plaintiff's performance even though Plaintiff was an Associate managing a Vice President's book of business and moreover, plaintiff was simultaneously asked to grow his book of business by *5%*. Despite exceeded the organization's expectations by growing his book of business to *17%*, while exceeding his peers who had a lighter workload. Plaintiff continues by referencing that Richard Haug created the Plaintiff's year-end review even though the guidance of Eva Robinson, even though Mr. Haug had departed from the enterprise and also a tool to continue to generate a rationale to *ease* the Plaintiff out of the organization.

39.     On or around February of 2017, Plaintiff met with Peter Scher - Head of Corporate Social Responsibility, about career aspirations and transferring into a different role. Peter Scher expressed that it would be a good idea for the Plaintiff to explore opportunities in the Commercial Banking Division of the Bank and how he had help to make this transition for another employee some time ago to the Commercial Banking Group, as the plaintiff as the Plaintiff alleges that Peter Scher was also aware of the internal *"scheme"* to discharge the Plaintiff on behalf of Jamie Diamond and the Plaintiff's managers.

40.     Around February of 2017, Plaintiff met with Peter Scher - Head of Corporate Social

Responsibility, about career aspirations and transferring into a different role. Peter Scher expressed that it would be a good idea for the Plaintiff to explore opportunities in the Commercial Banking Division of the Bank and how he had help to make this transition for another employee some time ago to the Commercial Banking Group, as the plaintiff as the Plaintiff alleges that Peter Scher was also aware of the internal *"scheme"* to discharge the Plaintiff on behalf of Jamie Diamond and the Plaintiff's managers. Plaintiff communicated several times to Miriam Del Cruz, Eva Robinson and Andrew T. Smith the strong desire to transition away from the group, post Eva Robinson *"outing"* of the Plaintiff as a *Whistleblower* during the first quarter of 2017.

41.      Plaintiff continues by referencing that the harassment was beyond pervasive and humiliating due to the management's unfair practices as at one point, the Plaintiff alleges that words were *"confrontational"* exchanged between the Plaintiff and the manager, Eva Robinson later referenced to the employee **"I know judges"**. On **March 5, 2017** at **9:28 P.M.**, plaintiff received communication from Employee Relations concerning the Plaintiff creating an "alleged" disruptive work environment *(back and forth communication with Eva Robinson & Keith Kadish - verbal "disruptive" incident* **March 6, 2017**), due to the manger attempting to fabricate a rationale to discharge the Plaintiff, creating confusion and engaging her subordinates to influence frustration towards the Plaintiff through pervasive harassment.

42.      Plaintiff would later be advised by Employee Relations not return to work the following day as Employee Relations requested that the Plaintiff allow the Enterprise to conduct an investigation, Plaintiff would later be advised to return to the office (48 hours) the following day, due to the consistent and repetitive harassment by management. Plaintiff continues by referencing that Employee Relations **again** at this moment had *opportunity* to properly investigate the root cause of the harassment and or transfer the Plaintiff away from the hostile work environment which the Plaintiff had requested several times.

43.      Prior to the Plaintiff's departure for short-term disability leave, Plaintiff received communication from Wanda Gilliam - **Executive Assistant** about un-submitted travel expenses. Ms. Gilliam advised that she was sent to aid the Plaintiff in processing these transactions, but she also *"projected"* that the Plaintiff was being placed on *leave* and Plaintiff alleges that Ms. Gilliam was aware of the *"scheme"*. Plaintiff allowed Ms. Gilliam to conduct her duties, but reviewed that Ms. Gilliam intentionally made error that

would have caused an infraction with the Plaintiff and the Enterprise in accordance to the firm's expense policy. Plaintiff made the corrections and then made the submission as the Plaintiff alleges that Ms. Gilliam may have been instructed to "*sabotage*" the Plaintiff with the intent of this being a rationale for discharge.

44.     Plaintiff continues by referencing that the Enterprise continued to take steps to interfere with the Plaintiff's employment through methods of intrusive invasion of privacy and electronic monitoring. On **March 28, 2017**, Plaintiff took short-term leave with a partial approval from J.P. Morgan internal disability staff with a partial approval. On **April 18, 2017**, the Plaintiff medical leave was denied due to a delay from the Plaintiff staff. Plaintiff received five phones from Elisa Koy - **Human Resources Executive** [1.1c (e)] concerning the plaintiff's leave. Within 24 hours of the Plaintiff denial from J.P. Morgan's medical staff, the medical leave was fully approved after receiving the required documentation, but on **April 20, 2017**, Elisa Koy sent a letter to the Plaintiff, stating that Plaintiff would be required to return back to by **May 5, 2017** or plaintiff would be terminated and was aware of the scheme.

45.     While on medical leave, Plaintiff received communication from the Plaintiff's clients pertaining check-in on the Plaintiff's medical condition and also received communication from the Plaintiff that Defendant had handed-off the Plaintiff's book of Business to a Senior Vice President - Kevin Carr.

*Diagram 1.1c All Human Resources &*



46.     Plaintiff alleges that the Respondent intentionally singled-out the Plaintiff, hence encouraging the harassment by furthering the conduct through a "*hub-spoke conspiracy*" to restrain the Plaintiff the opportunity of enjoying the same employment opportunities as other similar situated employees due to discriminatory motives. Plaintiff continues that Leaderships conduct was intentional reckless, discriminatory and at all-times had the knowledge of the risks it was subjecting the enterprise and Plaintiff through its use of un-ethical means of serial surveillance.

47.     Plaintiff continues by referencing that the Mr. David Rubenstein intentional violated his fiduciary obligation to his Enterprise by influencing the course and decisions of J.P. Morgan Chase & Co. and the terms and conditions of the Plaintiff's employment in capacity and hence subjecting the Plaintiff to economic and professional harm and his involvement would be confirmed by his Jefferey Ferguson – The Carlyle Group General Counsel as Mr. Fergusons communication referenced that Mr. Rubenstein acting on his own behalf and not under the umbrella of the Enterprise, as the Plaintiff alleges that Mr. Ferguson was also aware of the associated regulatory risk with the interference by David Rubenstein and its impact to his Enterprise, hence the organizational restructuring of each respective Enterprise. Plaintiff continues by referencing that in connection to the gross misconduct by J.P. Morgan and the associated Executives (Jamie Diamond & Peter Scher), Mr. Rubenstein would aid J.P. Morgan Chase on several occasions

14

through "*public forms*" engagement on enhancing its reputation in Washington D.C.and other effected markets.

48.     Plaintiff continues by referencing that the Respondent would continue to engage in the intentional discrimination and through their efforts, would willful and recklessly discriminate against the Plaintiff by replacing the Plaintiff while on medical-leave **May 26, 2017** and by replacing the Plaintiff with an employee outside a protected class "Michael Schwartz" - **Role 170034441.**

49.     Plaintiff continues by referencing that J.P. Morgan Chase & Co. continued to further the discriminatory conduct through the internal investigation by James O'Donnell - **Global Security Investigations May 30, 2017**. Plaintiff continues by referencing at all times the Respondent was aware that the Plaintiff was on medical leave, that Ms. Gilliam had taken the corrective measures into the Plaintiff late submission and that the furtherance and *timely* inquiry into the Plaintiff by Mr. O'Donnell investigator concerning an investigation into the Plaintiff employment with the firm was a continuance of the hostility within the work environment and unfair treatment. Plaintiff also references that Mr. O'Donnell lied to the Plaintiff concerning the investigation and its origin and that the Respondent was engaging in pretextual discrimination.

50.     Plaintiff continues by referencing the escalation of the matter to other Senior Executives with-in the origination as the Plaintiff wanted to ensure a fair investigation process. Plaintiff made contact with Jim Maxon - **J.P. Morgan's Global Investigations Unit Senior Executive** [Diagram 1.1b (Y)] and referenced the issue concerning an alleged investigation into the Plaintiff's expenses. Plaintiff asked Mr. Maxon for his support with making sure James O'Donnell conduct a thorough investigation, since he's a Senior Executive within that unit and is a primary point person for Jamie Diamond – **Chief Executive Officer of J.P. Morgan** in the Mid-Atlantic Region. Plaintiff continued to work through the process with the GSI team.

51.     Plaintiff continues by referencing that the Enterprise would merely place the Plaintiff under an investigation into his alleged corporate-card usage as methodology to justify a pretextual, deceptive employment and retaliatory discharge of the Plaintiff in conspiracy between HR and the Business's *(Diagram 1.1c)*.

52.     The Corporate Expenses in questions are as follows:

a) $210.00 Client Re-printed Presentation at FedEx;

b) One week Hotel stay in New York (during firm sponsored training);

c) Uber Transactions that defaulted to Plaintiff's corporate card (reviewed and approved by firm's expense management team prior to investigation, as this was identified as an internally know issue).

53.      In or around June of 2017, Plaintiff continued to attempt to make an internal transitioning from the Washington D.C. group and Michelle Conklin –**Receivables Operations** referenced **"bad manager"** as the Plaintiff alleges that the Plaintiff's attempts to transition was consistently being interfered with through the encouragement of Leadership, as the Plaintiff alleges that Michelle Conklin whose direct manager at the time referenced that the Respondent was engaging in direct discrimination by treating the Plaintiff unfairly through its *"scheme"* through the encouragement of Leadership

54.      On **June 15, 2017** at 7:20 P.M., Plaintiff spoke with Eva Robinson concerning the Plaintiff's partial return to the office and later received communication from Ms. Robinson referencing the Plaintiff's return as *"fully recovered"* and would be working on special projects. On **June 16, 2017** at 7:15 a.m. Miriam De La Cruz referenced that her division had gone through a restructuring on **April 4, 2017** and that she no longer covers the Plaintiff's line of business. Plaintiff alleges that the re-organization of this division was in connection to encouraging the reckless conduct by Senior Executives within the Enterprise as all parties had knowledge of the conduct and due to the *"power structure"* within the Enterprise; all associated parties engaged in the conduct & associated regulatory exposure.

55.      Plaintiff escalated the matter to Pat Press and Jack Martin – **Employee Relations Executive Directors** and was later connected with Jean Hinsman & Brenda McKee – **Employee Relations Representatives**, who would have had the capacity to know about the *"scheme"*. On **June 19, 2017** Plaintiff and all colleagues were notified that a new member of the team Michael Schwartz – **New Employee** [Exhibit 1.1E (T)] would be joining the team and Eva Robinson referenced that this member would be joining J.P. Morgan the week of **July 10, 2017** *(which is the same week that Plaintiff was discharged)*.

56.      Plaintiff continues by alleging that an Eva Robinson attempted to aid the Plaintiff through the reckless conduct as she and many other Executives with-in the organization were bystanders to the intentional discriminatory conduct being encouraged by leadership. On **June 20, 2017 at 11:02 a.m.**, received communication from *"Dena Davis – USDA Acting Director/Special Investigator of the Civil*

*Rights Division"* due to the hostile work environment, but was unable to remember due to the report to the EEOC to intervein with the discriminatory and pervasive conduct because of the "*phycological harm*".

57.      Plaintiff made communication to Jean Hinsman concerning the out-reach from Dena Davis and Jean Hinsman referenced that the Plaintiff should make communication to management. Plaintiff later made communication with Andrew T. Smith [Exhibit 1.1E (D)] and Eva Robinson [Exhibit 1.1E (E)] on **June 22, 2017** at 10:15 a.m. about this communication with the Government official and the Plaintiff alleges that Andrew T. Smith was aware of the "*scheme*" as well. Plaintiff made several attempts to complete his newly provided assignments and consistently received interference from management and fellow colleagues. This treatment occurred for weeks with Eva Robinson, Andrew T. Smith, Brenda McKee – **Employee Relations** [1.1c (x)], Jean Hinsman – **Employee Relations** [1.1c (x1)] and Miriam De La Cruz all engaged in various forms of communication.

58.      Plaintiff made communication to Patricia David concerning the connection with Carlo Frappolli and she mentioned that she would be connecting with him on Thursday, **June 22, 2017**. Carlo Frappolli's team created a role at **J.P. Morgan Req. ID. 170067537** – [Exhibit 1.1c (k)] on **June 23, 2017** that was directly applicable to the Plaintiff's professional skills. The role had a *Department of Labor disclaimer* that was not traditional to most open opportunities at the firm, but the job was within the Public Sector and was positioned in New York and Washington D.C., as the Plaintiff continues by referencing that this was done to shield the enterprise from liability as Plaintiff alleges that Carlo was also aware of the "*scheme*" as the Plaintiff continues by referencing that the conduct was encouraged by management.

59.      Plaintiff had communications with Carlo Frappolli, **Head of North America J.P. Morgan Talent** [Diagram 1.1b], began connecting Plaintiff with Sameera Sabherwal - **Head of Front Office Banking** [Diagram 1.1b], and Jacqueline O'Neal - **Talent Re-assignment Specialist** [Diagram 1.1c (h)]. Plaintiff continues by referencing that that conduct "*trickled-down*" the chain and was grossly encouraged by Leadership, Human Resources and the Business.

60.      Plaintiff alleges that on **June 26, 2017** and the Respondent continued to further their surveillance through various means of stalking the Plaintiff across state-lines and allegedly monitoring the Plaintiff inside his home. Plaintiff continues by referencing that this was done with the intent to manage the Plaintiff outside the organization and also in relations to the Plaintiff's communication.

61.    Plaintiff references that during his meeting with Marcus Johnson– Treasury Payments General Counsel, he continued to ask the Plaintiff probing questions pertaining the Plaintiff's relationship with his manager and her treatment of the Plaintiff.

62.    Plaintiff alleges that the more people the Plaintiff met with internally, the Respondent made communication with pertaining the Plaintiff furthering the scheme and implicating more and more Executives within J.P. Morgan Chase & Co. "scheme". Plaintiff continues by referencing that on **June 27, 2017**, Plaintiff had a meeting with a former Citigroup colleague Mark Berg - *Executive Director* and reports to Mary Callahan Erdoes – **CEO of Asset & Wealth Management** from Citigroup at J.P. Morgan's Park Ave. office. Mr. Berg and the plaintiff discuss the plaintiff attempting to transition away from the Washington D.C. office. Mark Berg referenced to the Plaintiff that he should also reach out to Donald Felix – **Managing Director in Consumer Banking J.P. Morgan**, who was also a former Citigroup employee from the FIG - Corporate and Investment Banking Group in New York.

63.    Plaintiff continues by referencing that the Respondents continued to engage in the *serial criminal conduct* through the means of surveilling the Plaintiff on **June 27, 2017** through the interaction with a former Citigroup employee (Edwina Gregg) that the Plaintiff references the Respondent used to shield the Enterprise of the known associated risk, who the Plaintiff references was sent by the manager – Eva Robinson to direct the Plaintiff's to the decision makers.  Plaintiff continues by referencing that the Enterprise took additional measures to monitor the Plaintiff's communication as when the Plaintiff made communication with Mr. Felix, the communication had been reverted to Ms. Robinson and she intentionally *"vocalized"* that Mr. Felix had made communication with her directly. Plaintiff alleges that the Respondent had a technological application that allowed the Plaintiff's communication t be re-directed to key Executives engaged in the scheme.

64.    On **July 6, 2017** at 6:57 p.m., Plaintiff called to Clarissa Ramos-Cafarell - **Employee Relations** [1.1c (s)], and expressed that Plaintiff needed support as he has exhausted every channel on her team with trying to obtain the opportunity to complete his work and maintain his job. Clarissa Ramos-Cafarell, expressed that she would look into the matter that Friday afternoon. Plaintiff made contact with Daniel Pinto's **CEO of Corporate and Investment Banking** administrative assistant in London on **July 6, 2017**

and she wasn't helpful, maybe she was she was busy, but not helpful, as she referenced that she'll hold onto the Plaintiff's communication.

65.     Plaintiff continues by referencing that James O'Donnell from the Global Security Unit continued to conspire with the other Executives to sabotage the Plaintiff with an investigation into his corporate card usage, while effectively aligning the completion of the investigation into the alleged corporate-card mis-usage consistent to the Plaintiff's disability coverage under Family Medical Leave Act coverage by concluding the investigation days **(2)** post the exhaustion of Family Medical Leave Act days later, while failing to take into account that the Plaintiff was covered under Washington D.C. Family Medical Leave Act, which had not been exhausted *(136 hours remaining),* through the guidance of management.

66.     On **July 7, 2017**, Plaintiff received both verbal confirmations at **11:04 a.m**. from James O'Donnell that J.P. Morgan did not find anything fraudulent within his investigation, as the Plaintiff referenced that his Uber account had been hacked and charges were defaulting to his corporate card "***Uber would later release communication about the 57 million user account breach***".

67.     Plaintiff continues by referencing that on **July 7, 2017,** the Respondent engaged in the serial surveillance of the Plaintiff with the intent to manage the Plaintiff through the use of two women under the control of the Respondent attempting to influence the Plaintiff to depart from the enterprise in Edgewater, New Jersey.

68.     Plaintiff continues again on **by referencing that was** intercepted again by a Nathaniel Persily - **Stanford University Law Legal Professor** and during the interaction, Mr. Persily referenced that he had a sister that was a Professor at American University in the School of Business and the Plaintiff alleges that those statements were meant to link the conduct back to Peter Scher.

69.     During the week of **July 10, 2017**, Plaintiff emailed Peter Scher requesting support with transitioning out of his group. Peter's assistant Michelle Grasso reached out to the Plaintiff and referenced that that Peter was currently busy and that Peter recommended touching base with Nelli Childs - **HR Executive** [1.1c (c)]. Plaintiff spoke with Nelli Childs and was asked about Plaintiff area of interest and advised the Plaintiff to speak with Ryann Engel Plaintiff HR representative. Plaintiff's HR representative received communication from Ryann Engel, Human Resources, about communication with Peter Scher and asked how she could be of help. Plaintiff advised Ryann Engel that Plaintiff has made several

attempts to transition out of group and Ryann Engel was aware of Plaintiff's **strong** desire to transition

into a different role outside of his group, due to the *pervasive* harassment and Ms. Ryann was not

supportive due to the internal and potential external encouragement to displace the Plaintiff with the

encouragement of Leadership.

70.    Plaintiff later communicated with Human Resource Executive Carlo Frappolli about an

opportunity **170067537** and was advised to touch base with Kenrick Wolfe - **HR Recruiter**.  Plaintiff later

spoke with Kenrick Wolfe on **July 6, 2017** at 1:00 p.m. concerning the opportunity and Plaintiff alleges

that Kenrick Wolf was a rogue employee associated with the "scheme" with the purpose of circumventing

liability from the Enterprise.  Plaintiff continues by referencing that post the communication with Kenrick

Wolf, Plaintiff made communication with the hiring manager Etienne Lacroix - **Executive Director**

[1.1C- (L)] and Poorvi Kunzru [1.1C- (M)] about the group, who referenced that he was not aware of an

open role within this group as Human Resources continued to further the "scheme".

71.    Plaintiff continues by referencing that Enterprise intentionally monitored the Plaintiff's

communication as post the Plaintiff's communication with Poorvi Kunzru, she later had a conversation

with Keith Kadish at 10:00 a.m. and then spoke with Eva Robinson.

72.    Plaintiff continues by referencing that "Higher-up" management had the intent to

retaliate/discharge the Plaintiff in violation of the Plaintiff Civil Rights and began to engage in methods to

*"shield the Enterprise from the reckless scheme"* the same week of the Plaintiff's discharge by:

A.    Making changes to the Enterprise Employment Manual (Plaintiff alleges that these changes were meant to cause adverse effect onto the Plaintiff) – *On behalf of the Head of Human Resources John Donnelley*

B.    Disburse Company Policy to the Plaintiff pertaining the Enterprises *video and audio recording communications Policies* - *On behalf of the Head of Human Resources John Donnelley*

C.    Disburse Company Policy to the Plaintiff pertaining the Enterprises *Un-fair hiring practices or side employment agreements*- *On behalf of the Head of Human Resources John Donnelley*

D.    Disburse Company Policy to the Plaintiff pertaining the Enterprises *from Daniel J. Conti - Head of Employee Assistance at 10:06 a.m. on July 11, 2017 Program [1.1c (z1)]* concerning the Plaintiff taking a "Stress Assessment". Plaintiff alleges that this was conduct on the basis of gathering the Plaintiff's medical information to shield the Enterprise from liability.

73.    Plaintiff continues by referencing that Senior Leadership was aware and alleges that it had

evidence of the un-savory, reprehensible and un-ethical conduct of several Executives. Plaintiff continues

by referencing that the Enterprise intentionally engaged in gross mis-conduct on the basis of attempting to

find another pretextual rationale of discharging the Plaintiff by advising colleagues to make fabricated and slanderous allegations into the employee hotline referencing that the employee as a *"Direct Threat & Health Risk to others"* in the workplace. On **July 14, 2017**, Plaintiff alleges that Eva Robinson received the approval for the Plaintiff's discharge from higher-up management and Ms. Eva Robinson yelled *"Docket"* indicating that the Plaintiff had a *"lawsuit"*. Plaintiff continues by referencing that Eva Robinson requested that Shawn Darling – **Executive Director** attend the Plaintiff's dismissal meeting and Ms. Robinson referenced that the internal investigation conducted by James O'Donnell references that the should be discharged, even though the internal investigation that was conducted by the same investigators referenced that nothing was discovered to be fraudulent in his findings (*In writing and verbally*). Plaintiff was advised by Senior Executive Seekou Kaaland as common practice to discharge an employee. Once Ms. Robinson advised the Plaintiff of the discharge, she attempted to rush the Plaintiff out of the office while Daniel Zelikow – **Co-Head of Public Sector Infrastructure Finance** and several employees *"over a dozen"* from other departments watched the plaintiff walkout of the office. To add insult to injury, Plaintiff references that the Enterprise had called a Security Guard to remove the Plaintiff from the office. Once Ms. Robinson escorted the Plaintiff outside the building, the Security officer intercepted the Plaintiff without further contact between the Plaintiff and the Security Guard.

74.    On **July 14, 2017**, Plaintiff sent a communication to several Executives that the Plaintiff had communication with or associates within the organization which the Plaintiff alleges would expose the discriminatory and un-ethical conduct by all associated parties. Plaintiff received a phone call with-in *minutes* from Clarissa Ramos-Cafarell – **Global Employee Relations Executive** asked the Plaintiff *"what was referenced as the rationale for discharge"*.

75.    Plaintiff called Daniel Pinto – **Head of Corporate and Investment Banking CEO** on **July 17, 2017** at 4:24 P.M. while in London and referenced that he was unable to speak. Plaintiff later received communication from Robin Leopold – **Global Head of Human Resources** [1.1c (b)] post the communication, but the Plaintiff was unable to make the communication. On **July 19, 2017** received several communications from Employee Relations concerning an appeal of the Plaintiff's employment termination from Jean Ginsberg and the matter was later transferred to the complexity to Clarissa Ramos-Cafarell – **Global Employee Relations Executive.**

76.    On **July 21, 2017**, Plaintiff received communication from Patricia David – Human Resources Executive concerning the plaintiff's discharge. She asked if *"The Plaintiff returned to the office to sue Eva Robinson"* and she admitted that the Plaintiff was ***Treated Unfairly, Crime, Crisis*** and she continued by referencing that the Plaintiff was defending himself and in a separate communication referenced that the conduct was **not** committed by his manager, but also mentioned that the Plaintiff can ***PROVE*** everything!

77.    Plaintiff continues by referencing that during the **July 21, 2017** call, Patricia David asked the Plaintiff why he made the phone-call into Employee Relations and the Plaintiff referenced because you, Ms. David told the Plaintiff to do so in connection to the harassment. Plaintiff continues by referencing that during the investigation into the harassment allegations, the Employee Relations representative had the opportunity to discover the root-cause of the harassment, and alleges due to its complexity and normalization of the conduct failed or refused to prevent the conduct from persisting, but encouraged the conduct by using means to aid the process and shield the harassers and enterprise from liability due to the overwhelming power-imbalance, while incentivized bad and repulsive behavior.

78.    Plaintiff continues by referencing that the enforcement standard of associated claims would nudge the respective Respondents to engage in a rampage of "*global diversity initiatives*" post the Plaintiff's communication and out-spokenness to leadership ability on "*Jamie Diamond should take the lead on diversity and women initiatives"*, as the Plaintiff alleges that the Board of Directors may have been on the call in connection to several breaches of fiduciary obligations by leadership. Plaintiff continues by referencing to Ms. David that the Enterprise would bring-in a **"Black Women-in"** to address this discriminatory conduct and how *"women are usually brought-in to address issues"* (***J.P. Morgan Chase Board Member Crandall Bowels*** would later step-down from the Board and ***Mellody Hobson*** would be appointed – Public Responsibility and Audit Committee in March of 2018, even though Plaintiff references that she had been auditioning for the role months prior to the appointment by making public appearances on in coordination with J.P. Morgan Chase & Co.).

79.    Plaintiff continues that a combination of communications by the Plaintiff to the Respondent and the acquisition of the Plaintiff's communication without the consent of the Plaintiff by the Respondent would spree a shift in Global Diversity and Inclusion awareness across several industries, to compensate for their reckless, egregious and in accordance's to several scenarios that the plaintiff referenced during a

dinner on **August 17, 2017** in Washington D.C. on K street that the Plaintiff alleges would put each respective Enterprise on *Edge* and that the Plaintiff referenced that the J.P. Morgan's most **legitimate** successor was Jes Steley – *CEO of Barclay*!

80.     It would single-handily shift the direction of the Enterprise as publicly referenced in an interview on **November 9, 2017** in New York City by a reporter Brent Montgomery from the Hollywood Reporter made reference to the Plaintiff's communication to a phrase that the Plaintiff mentioned during dinner "*HR/PR*" at **(29:05)** how a one-off or single-handed statement can change the organizational structure of a company during the event hosted by the *New York Times* and moderated by Andrew Sorkin and the question was directed to Kenneth Chenault – Chairman & CEO of American Express and Larry Fink – Chairman & CEO of BlackRock, Plaintiff continues by referencing that he provided an unique method to inducing change that would be repeated in on **December 3, 2018** interview.

81.     Plaintiff continues by referencing during the **August 17, 2017** dinner, that the Executives didn't just hurt their personal and professional reputation and that they would give each other-up to reserve their reputations, but that also exposed their Enterprises to Risk (**i.e.** *Sovereignty Risk, Geo-Political Risk, Reputation Risk, Harm Shareholder, Harm to the Global Economy and on & on*) and the fact that they brought-in another party to aid them with the process was even worst. On **October 25, 2017**, David Rubenstein would step-down from the Carlyle Group as Co-CEO and he would make a series of public interviews to sustain the perception of strengthen and attempt to aid J.P. Morgan – Jamie Diamond due to the harm to that Enterprise and those Executives. Plaintiff continues by referencing that on **January 23, 2018** at the World Economic Forum – **The Next Financial Crisis**, similar communication would be "*echoed*" by Vice Chairman Fang Xinghai - China Securities Regulatory Commission and focused on the "*containment*" of an Enterprise that posed a risk to the entire system as the communication of the Executives conduct spread globally with the attendance of (**Barclays** CEO – Jes Staley, **Citigroup** CEO – Michael Corbat, **The Carlyle Group** Co- Chairman – David Rubenstein).

82.     Plaintiff continues by referencing that the enterprise would embrace the Plaintiff intellectual capital and change business models, promote Executive into new positions as the Plaintiff referenced. Plaintiff continues that his intellectual property "Big Ideas" would be implemented not only by J.P. Morgan Chase & Co. but it would be embraced by other Enterprises on Wallstreet.

83.     Plaintiff continues by referencing that opportunities in African and also referenced a two family

friends that are prominent Executives. Plaintiff continues by referencing a plan for Africa's growth over a

napkin, as follows;

*"You __Must__ make the Continent Attractive for Investment"*

     A.   *Media*

     B.   *Culture*

           I.   *Music*

          II.   *Movies*

         III.   *Sports - Basketball*

     C.   *Policy – Leadership – International Aid*

     D.   *IntraTrade - Trade Agreements – Africa Free Trade Agreement*

     E.   *Women in Power – Collaborative Engagement*

     F.   *Healthcare*

     G.   *Infrastructure Deals – Belt & Road – ESG*

     H.   *Mitigate Corruption*

and the Executives would open-up Africa as referenced on August 17, 2017.



84.     Plaintiff continues by referencing that on **September 9, 2017**, the plaintiff was intercepted again

in Baltimore, M.D. at a restaurant by an individual who referred himself as Jeffrey B. Clancy a New York

based attorney from – **Willkie Farr & Gallagher**. Plaintiff alleges that the interaction was meant to aid

the Plaintiff in to re-reference his notes and attempt to recall all the facts and events that transpired during

the course of his discharge as the entire event needed to be flushed-out again further. The Plaintiff alleges

that Jeffrey B. Clancy sent an employee/consultant to intercept the Plaintiff and advise the plaintiff that Mr. Jamie Diamond – **CEO of J.P. Morgan Chase** was involved in Mr. Obia's discharge. Mr. Clancy also referenced that *"All your friends took the money & Opportunity"*

85.     On **July 21, 2017** at 4:59 P.M., Plaintiff received communication (malware) from Kim Teta (Clarissa Ramos-Cafarell's administrative assistant). Plaintiff continues by referencing that the embedded attachments had compressed of phishing software to aid the Defendants to conduct data mining exercises, gathering of forensics from the Plaintiff's computer hard drive, mobile devices which would give the Respondent 24by7 access to the Plaintiff's communication. Plaintiff continues by referencing that this give the Respondent access to his IP addresses, breaking the encryption of the Plaintiff's text message communication, hence furthering the Defendants invasion of privacy, while interfering with the Plaintiff's personal relationships with the intent *to "choke"* his access to resources and an attempt to *silence* the Plaintiff.

86.     On **July 21, 2017,** the plaintiff received communication from Jay Tyler – **CFO of the FDA** concerning a follow-up meeting over lunch, from the Plaintiff's last communication pertaining <u>employment</u> opportunities at the FDA. Plaintiff continues by referencing that the Respondents engaged in intrusive conduct by listening to the Plaintiff's communication through the use of a Parabolic microphone outside the restaurant to intercept the Plaintiff's communication. Plaintiff continues by referencing during the Respondent would continue to engage in reckless conduct on the basis of furthering there *"serial criminal conduct"* and by also abusing government officials.





## Uber Hid 2016 Breach, Paying Hackers to Delete Stolen Data

Uber's headquarters in San Francisco. The ride-hailing company said information on driver and rider names, emails and telephone numbers had been compromised in a data breach.
Ryan Young for The New York Times

Just $15.99 $9.99 a month.                                    SUBSCRIBE  >

87.     Plaintiff continues by referencing that the Respondent would engage in additional invasion of the Plaintiff's privacy by hacking into the Plaintiff's mobile device and manipulating with the Plaintiff's Uber application. Plaintiff with the intent to seduce the plaintiff and strategically placing attractive women "*seduction*" into the Plaintiff's Uber Rides and every single ride was intentionally and drastically discounted as followed;

### Hacked Trips

- ✓ On October 20, 2017 at 12:27 P.M., **From** 131 M street NE, Washington D.C. **To** 22 Independence Ave. SW, Washington D.C. **- 2.5 Miles $ .35**

- ✓ On October 20, 2017 at 9:36 A.M. **From** 611 H St NW, Washington D.C.20006 **To - 1.3 miles - $ .69**

- ✓ October 20, 2017 at 8:59 A.M. **From** 3800 Reservoir Rd NW, Washington, DC 20007 **To** 727 17th Street N.W. Washington D.C. **– 3.9 miles $0.00**

- ✓ On October 20, 2017 at 2:24 P.M. **From** 1707a L St. N.W., Washington D.C. 20036 **To** 100 Florida Ave N.E. Washington D.C. **- 2.0 miles $.31**

88.     Julie Ginsberg referenced that she will schedule a follow-up call concerning the rationale concerning the discharge and went back and forth concerning the alleged expenses at question. Ms. Ginsberg later referenced that it wouldn't be a bad idea form the plaintiff to seek legal support, as the Plaintiff alleges that Ms. Ginsberg saw a clear discrepancy with internal investigation and rationale for discharge.

89.     Plaintiff spoke with J.P. Morgan STD (Short Term Disability) management team and they

referenced that Plaintiff was unlawfully discharged as the plaintiff was still covered by Washington D.C. FMLA *(had a remainder of over 100 hours of coverage)* and was able to send that communication to the Plaintiff. Plaintiff later filed a complaint with the Office of Human Rights in Washington D.C. on **August 4, 2017**. Seven days post the filing of that complaint with The Office of Human Rights in Washington D.C., plaintiff alleges that he was under surveillance by J.P. Morgan because the Executive of record to that complaint was John Donnelly – **J.P. Morgan's Head of Human Resources** (In connection to the deceptive methods of attempts to discharge the Plaintiff) was replaced as the Head of HR on **August 10, 2017** and be named the Vice Chairman of HR (reporting directly to Jamie Diamond – **CEO of J.P. Morgan Chase & Co.**) while being replaced by Robin Leopold, the complaint was never shared with the Defendant.

90.     In or around the third week of August of 2017, Plaintiff alleges that all Defendants continued to engage in the repulsive conduct against by converting the Plaintiff's apartment into a "*laboratory*" and extracting information from the Plaintiff's apartment, while making the Plaintiff an experimental subject through the monitoring of the Plaintiff's medical condition, sleeping patterns and etc. Plaintiff continues by referencing that these medial assessments were gained by fabricating, false, misleading and defamatory information pertaining the Plaintiff *(falsely incarcerating the plaintiff in a federal correctional jail and then placing the plaintiff into a halfway-house outside of Washington D.C.)*, even though the plaintiff was in communication with Mr. Karl Racine - **Attorney General of Washington D.C. on July 28, 2017** at 7:30 P.M. concerning obtaining legal representation, while the plaintiff was under excessive and repulsive surveillance by the Defendants.

91.     Plaintiff continues by referencing the gathering of the Plaintiffs Bio-metrics, Bio-Rhythms and Human Behavioral data of the Plaintiff in his home by using Consulting firms, University Researchers and Medical Professionals on the basis of gathering forensics *(Metadata, Medical Samples, Electronic Discovery)* to conduct predictive analytics. Plaintiff continues that the Respondent engaged in healthcare informatics (**i.e.** sharing of the plaintiff's medical information amongst providers and vendors without the consent of the plaintiff via IBM Watson as referenced by Patricia David during a Town Hall at Fordham University " Diversity Matters in Business") and the Plaintiff continues by referencing that the

respondents engaged in other methods such as precision medicine in coordination of publicly accusing the Plaintiff of comminuting a crime - felony, hence causing further public humiliation in the Plaintiff's place of residence and further subjecting the Plaintiff's to further humiliation at the Plaintiff's Educational Institution – American University were Peter Scher sits on the Board of Director.

92.    Plaintiff continues by referencing that the Respondent is used the services of Consulting firms (Sean Steele - **InfoLocke Systems**, Angela Lewis - **Booze Allen Hamilton**), University Researchers (Mariko Moher – **Willams College Early Child Development Center** and Jose Aparicio – **Johns Hopkins Perception & Mind Laboratory Center)**. Ms. Mariko Moher, shewould then transfer to Connecticut College and take a role in the Office of Leadership and Gifts/Giving and as a Leadership Gifts Officer, which is the Alma meter of Mr. David Rubensteins Ex-wife, Ms. Alice Rogoff and other professionals to gather forensics while coordinating with the Plaintiff's Bozzuto Management Co. landlords. Plaintiff continues by referencing that his Property Managers/Owners and building owners were aware of the conduct and that on **August 28, 2017**, a meeting was held in the club house and that the following associated owners' licenses plates are listed below, cupolaed with Sarah Scher – *Bozzuto Management Landlord* having knowledge of the intrusive conduct. Plaintiff continues by referencing that on **October 4, 2017**, Plaintiff received notification from Mauld Holt - **Administrator and Health Care Ombudsman** confirming that the Plaintiff's name was in-bedded in Washington D.C.'s Healthcare as being an incarcerated applicant. Ms. Holt continued by referencing that the Plaintiff had been allegedly released from a *"half-way"* House on **September 17, 2017**, which is one day from when the Plaintiff partially moved away from his apartment in Washington D.C. Plaintiff later made communication to the Jeffrey F. Varone - **CEO Hope Village** and confirmed with this team that the Plaintiff had never been in their system on **October 9, 2017**. On **October 11, 2017 at 11:03** a.m., Gary Watts – *Washington D.C. Employee* would remove the defamatory communication concerning the Plaintiff from Washington D.C.'s system, due the false representation of the Plaintiff in connection to the Defendant's reckless conduct. Plaintiff alleges that the Respondents would continue to interfere with the Plaintiff's medical visits, records on **October 26, 2017** (Baltimore), **November 21, 2017** (New York), **December 23, 2017** (Washington D.C.) and around February 2018 (Washington D.C.) by using methods such as intruding on medical visit's, tampering with the Plaintiff's medical records and fabricating a diagnosing of having

Hypertension and attempting to coordinate the plaintiff's care with the aid of physicians. Plaintiff continues by referencing at one that Jamie Diamond publicly disclosed and referenced that the Plaintiff had a medical condition with his heart and other privately help medical information pertaining the Plaintiff. Plaintiff continues by referencing that, in the attempt to return to the Plaintiff's apartment, post his departure, HR would force the Plaintiff's eviction due to the humiliation that the Plaintiff had endured in the further retaliation from the Respondents and by having the Plaintiff's landlord sign-off on the Plaintiff's eviction *"HR – Human Resources"* on **December 1, 2017.** Plaintiff continues by referencing that the Respondent conspired with the Plaintiffs landlord to create original content of the Plaintiff's activities through video surveillance.

93.      Plaintiff continues by referencing that the Respondent engaged in other intrusive and humiliating conduct by disclosing the Plaintiff's medical condition throughout the entire business community and then having this communication repeated at The World Economic Forum during a session: Data Responsibility in a Fractured World through a gesture by Ginni Rometty – CEO of IBM who Jamie Diamond confirmed to be his friend on CBS **September 20, 17**, while additional communication made by other CEO's at The World Economic Forum.

### Licenses Plate

**1).** VJU 7140 VA       **2).** 8CP 7032 MD       **3).** VLZ 4533 VA.       **4).** VUD 1364 VA



94.      Plaintiff continues by referencing that the defendant's gathered nude images of the Plaintiff and disseminated this content (*masturbation*), then recreating the humiliation via broadband television and cauterizing the content as *"hand modeling & living my best-life"* via other methods of publication.

harm and shame to the Plaintiff's to friends. Plaintiff continues by referencing that the Respondents would continue by mass publication of defamatory communication through several channels *(i.e. Radio, Television, Motion Picture and Print)* as a means of *professional retribution* for exposing unethical conduct.

95.    Plaintiff continues by referencing that the individuals that would be used in these mass publications of defamatory communication were people that the Plaintiff had direct or in-direct relationships with and were also names that the Plaintiff referenced during his **August 17, 2017** dinner. Additionally, the publication would also reference the Plaintiff's consumption of food (i.e. Across various publication methods, i.e. Milken Conference MSNBC – **Filling the Global Infrastructure Gap 2019, Netflix: Aziz Ansari**) through the gross invasion of the plaintiff's privacy. Plaintiff continues by referencing that the Respondents would continue to engaged in the repulsive conduct by engaging in means of humiliating the Plaintiff's family members in and having this communication disbusted via large audiences.

96.    Plaintiff continues by referencing, not only would the enterprise use the Plaintiff intellectual property to re-organize its internal businesses, but the Plaintiff *"Big Ideas"* would be used by other entities as well. Plaintiff continues by referencing those *"Big Ideas"* would spurred the global penetration towards diversity and how it could positive impact business models, but how it would aid some *"C-Suite Executives"* approach complex problems through a unique lens. Plaintiff continues by referencing that the his "*Intellectual Capital*" would shift multiple industry's and restructure several business models *(Forced Change Diagram)* through the lens of diversity, collaborations and open dialogue through the acquisition of his communication as Kim Teta – **J.P. Morgan Executive** referenced to the Plaintiff *"Your Phone"* as the Respondents had *"24by7"* access to the Plaintiff's Apple IPhone, which was also mentioned in the **November 9, 2017** interview.



97.    Plaintiff references that the Respondents went to the Plaintiff's Universities to gather the

Plaintiff's records on **September 21, 2017** and during a communication that was had between the

Plaintiff and Claudia Hoffman – **Director at American University**, she referenced that *"no*

*one"* can gain access to the Plaintiff's medical records as the Plaintiff alleges that the

Respondents attempted to access and also referenced "*Accounting*" in connection to the error that

the Plaintiff discovered at work and the communication that had spread to the Plaintiff's

University due the Respondents attempt to manage the crisis. Plaintiff continues by references

that the Respondent would engage in further reckless conduct by harming Morgan State

University and also directing resources to Morgan State University as the original source of the

conduct, with the intent to further spread the reckless conduct and publicly accusing the Plaintiff

of *"criminal conduct"* to shift the narrative away from the Respondents global repulsive conduct.

Plaintiff continues by referencing that in connection to the nefarious, humiliating, ultra-hazardous

and toxic defamatory communication pertaining, the communication would spread through the Plaintiff's

University. On **August of 2017**, the Plaintiff had a series of engagements at American Universities Pence

Library and the Plaintiff had the opportunity to connect with Khelani Clay – **American University**

**Liberians**. During one of the interactions with the Liberian, she referenced **"LAWSUIT"** prior to the

plaintiff's **August 22, 2017.** Plaintiff references that the content was intentional spread across the Plaintiff

place of Education with the intent to further humiliate the Plaintiff at American Universities and through-

out Washington D.C., by referring to the Plaintiff as *"Crazy, Paranoid and Mentally Unstable"*. Plaintiff

continues by referencing that on **August 22, 2017**, Officer Jones & Officer Graham at American

University approached Plaintiff while seated at a computer terminal in Pence Law Library for an alleged

disturbance on the basis of asking questions to the Liberian at the University.

98.     The two Officers asked that the Plaintiff to step into the hallway of Pence Library and began to

integrate the Plaintiff in front of by-standers. Plaintiff alleges that the Defendants used the interaction to

engage in furthering their medical assessments of the Plaintiff, while also attempting to fabricate a

rationale for discharging the Plaintiff as a Direct Threat, which the Plaintiff continues to allege occurred

days prior to his discharge.

**99.**     Plaintiff gathered himself, entered back into the Pence Library and went to see Corp *"Buck"*

Johnson **- Chief of Police at American University** to explain what transpired and to ask for an

investigation. Corp. Johnson would return back - *days later* to the Plaintiff and reference that

nothing negative would come-out of the investigation as the Plaintiff was not a disruption at

American University. Plaintiff continues by referencing that on **October 4, 2017**, Plaintiff met with

former Professor and referenced that something occurred at work and that the Plaintiff had an interest to

enter into Education and that it would be great is Morgan State and HBCU's received a series of resources

that would help these University expand and obtain national attention (**i.e.** Guest Speakers –

Public Relations, University Partnerships – Networking Events, Government Grants & Corporate

Partnerships. Plaintiff references that the Respondents would again create a spurred of

investments into these (Historical Black Colleges Universities) Universities in connection to their gross

misconduct and to also circumvent **Title XI Liability** from the University and students who were aware of

the conduct.

100.     Plaintiff continues that the mass publication of the Plaintiff's academic records or alleges

matriculation allegation, hence accusing the Plaintiff of a crime and causing harm ***not*** just to the Plaintiff,

but also to Morgan State University and its student body. Plaintiff references that Morgan State's

President – David Wilson would gathered a group of students and created a campaign "***We Graduate***" to

mitigate the harm and attempt to re-project the University's image in a positive manner and to attract

Kendrick LaMar, while the Respondents also aided other HBCU's that may-have been harmed by the Respondent conduct through the support of their associated partners and customers, before *strengthening* its partnership *efforts* with HBCU through its Advancing Black Pathway Initiative. Plaintiff continues by referencing that defamatory communication would be made through public forums by celebrities, actors and business Executives Globally.

### Diagram



101.    Additionally, Plaintiff alleges that in connection with the defamatory communication against the University and Plaintiff, I continue that President Wilson was given a "*Board of Director – Lumina Foundation*" through the services of Vox Media and its Associates on *January 5, 2018* and would be notified on *January 22, 2018* by **Maggie Kinnealey and Katie Miller** from VOX Global *(Crisis Management Firm in Washington D.C)* in Washington D.C. at the Plaintiff's medical visit. One of the individuals made contact with the Plaintiff with the intent to gain insight into the Plaintiff employment discharge and also referenced that they were sent by Peter Scher and that Morgan State had interfered with the Plaintiff's academics in connection to the associated conduct with the Plaintiff's employment. Plaintiff continues by referencing that on **February 6, 2018,** Plaintiff made communication with VOX Global concerning the interaction on **January 22, 2018** and then on **February 7, 2018** Morgan State University would publicly renew President David Wilson's employment agreement with the University.

33

102.     Plaintiff references that the Enterprise Executive Peter Scher coordinated this process to remove liability from American University where he is a Board member and his associated conduct. Additionally, Plaintiff continues that the **November 22, 2017** interview between Mellody Hobson and Jamie Diamond at The Economic Club in Chicago was due to the Plaintiff's request for accountability and during the interview at 51:45 the plaintiff's communication was repeated from **July 21, 2017** communication with HR Executive Patricia David. Jamie Diamond would continuance refer to an internal harassment issue which the Plaintiff references was pertaining the Plaintiff's discharge and then references that "***50% of students in inner-city schools don't graduate***" as a continuation of the Respondents Public Relations campaign associated with the public disclosure of the Plaintiff's discharge. Plaintiff continues by referencing that the Respondent would continue to engage in its ultrahazardous and *egregious* defamatory communication about the Plaintiffs allege inabilities. On **December 8, 2018**, J.P. Morgan would make a $6 million donation to Washington D.C. largest school districts to help to expand the pipeline of students studying technology-related fields *"Boost local Tech Workforce"* in Washington D.C. as a means to cover-up the intentional discriminatory conduct and harm to the Reputation of the organization and egregious conduct in Washington D.C.

103.     Mr. David Rubenstein would step down as Co-CEO of the Carlyle Group and move into the role of Co-Chairman, allegedly in connection to the malfeasance against the Plaintiff on **October 25, 2017**. On **December 18, 2018**, Plaintiff made communication to The Carlyle Groups General Counsel - Jeffrey Ferguson and he referenced that Mr. Rubenstein acted on his own behalf and referenced that his conduct was not under the umbrella of the Enterprise. Plaintiff continues by referencing that due to Mr. Rubenstein conduct, he would influence the de-stabilization of not just his Enterprise, but would also allegedly affect J.P. Morgan Chase & Co., hence causing The Carlyle Group to re-structure its management as well as J.P. Morgan Chase & Co. Glenn Yougkin & Kewsong Lee as Co. CEO's of The Carlyle Group on **October 25, 2017** with an effective appointment on **January 1, 2018.**

*104.*     Plaintiff continues by referencing that he would receive death threat over the course of several months and the Plaintiff alleges that the Defendants consistently still use unlawful surveillance on the Plaintiff, by stalking and intercepting the Plaintiff's travel, hence endangering the Plaintiffs well-being and stripping the Plaintiff of his dignity (**i.e.** *On November 30, 2017 Plaintiff references that the*

*Defendants stalked the Plaintiff from Baltimore to Washington D.C. via train and then Diane Padilla –*

**J.P. Morgan Executive Director General Counsel** *called the Plaintiff at* **12:12 P.M.,** *Plaintiff would be*

*followed from Washington D.C. to New York City by a former government official on* **November 2, 2017,**

**November 2, 2017,** Plaintiff would be intercepted at Cuny University in New York City, On ***November***

***30, 2017***, Plaintiff references that the Defendants stalked the Plaintiff from Baltimore to Washington D.C.

via. train and then Diane Padilla – **J.P. Morgan Executive Director & General Counsel called the**

**Plaintiff at 12:12 P.M.** while the stalker waived at the Plaintiff Standing outside of the Plaintiff's home

on **March 2, 2018** and intercepting the Plaintiff's communication.

## Cause of Action

### Count 1 - Claim for Relief

#### Tortuous Interference

Plaintiff references that David Rubenstein intentionally forced & induced J.P. Morgan Chase & Co. to break its contractual obligation to the Plaintiff, hence the pervasive and repulsive conduct against the plaintiff during and post the plaintiff's employment with J.P. Morgan Chase & Co. Plaintiff references that to prevail, one must establish a prima facie case; 1). The existence of a valid contract between the plaintiff and a third party, 2). The respondent's knowledge the contract, 3). The respondent's intentional procurement of the third-party's breach of the contract without justification, 4). Actual breach of the contract and the interference was improper 5). Damages resulting from the employment interference. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs right to be free from discrimination. Plaintiffs are entitled to their reasonable attorney's fees and costs of suit.**

### Count 2 - Claim for Relief

#### Vicarious Liability

Plaintiff references that he Enterprise was intentionally negligent in regards to supervising the associated Executives conduct and allowed and encourage the furtherance of the harassment against the Plaintiff as it was not only encouraged internally, but also encouraged by third-parties with the intent to impose harm to the Plaintiff with the endorsement of the Enterprise and the Plaintiff continues by referencing that the Enterprise is jointly directly liable for the harm created by its Directs and Officers as the Enterprise failed to act after the Plaintiff notified the Enterprise of the pervasive harassment and had the opportunity to stop

and prevent the conduct as the Plaintiff alleges that the conduct was occurring on behalf of the direction of Enterprise. Plaintiff references that to prevail, one must establish a prima facie case 1). The person who committed the tort must be an employee, 2). The tot must be committed in the course of employment. 3). The conduct of the employees benefited the employer. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 3 - Claim for Relief

### The Americans with Disabilities Act 1990 – Desperate Treatment - 42 U.S.C 12101

Plaintiff references that the respondent engaged in willful, repetitive and discriminatory conduct against the Plaintiff in violation of the Act. Plaintiff continues by referencing that the respondent (i.e. employer to discriminate against an individual with a disability in regard to any term, condition, or privilege of employment, including leaves of absence, sick leave, or any other leave). Plaintiff references that to prevail, one must establish a prima facie case; 1). The employee has a disability as defined by the ADA, 2). The employee informed the employer of his or her condition and requested an accommodation, 3). There was an accommodation available that would have been effective and would not have posed an undue hardship to the employer and 4). The employer failed to provide an accommodation. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 4 - Claim for Relief

### The Americans with Disabilities Act 1990 – Desperate Impact - 42 U.S.C 12101

Plaintiff references that due to the respondent's intentional discriminatory conduct against the Plaintiff was in violation of the Act. Plaintiff continues by referencing that the respondents conduct (**i.e.** Unfair treatment and that the respondent's disciplinary practice was statistically not in-line with other similarly situated employees and the reason provided to the Plaintiff was pre-textual.) Plaintiff references that to prevail, one must establish a prima facie case; 1). The employee is a member of a protected class (Race/disability), 2). The employee was qualified for a job benefit and as the employee applied for the job and qualified for the open position, 3). The employee was denied the job benefit and then fired, 4). The benefit remains available and was granted to someone outside of the protected class. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are**

entitled to their reasonable attorneys' fees and costs of suit.

## Count 5 - Claim for Relief

### The Washington D.C. Human Rights Act – Genetic Information - 2-1403.16

Plaintiff references that through several intrusions of the Plaintiff's personal and confidential information, the respondent continued to interfere with the Plaintiff's medical information. Plaintiff continues by references that the respondent took reckless and egregious means to gather the Plaintiff's medical information through the intrusion of the Plaintiff's home without the Plaintiff's consent. Plaintiff references that to prevail, one must establish a prima facie case; (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 6 - Claim for Relief

### The Washington D.C. Human Rights Act – Matriculation 2-1403.16

Plaintiff references that the respondent direct and intentional conduct subjected the Plaintiff to mass humiliation in connection to the Plaintiff's alleged lack of matriculation. Plaintiff continues that this conduct has caused harm to the Plaintiffs reputation to his social and professional statues through the mass publication (i.e. Mass Media) with the attempt to discredit and the Plaintiff's lack of qualifications and capabilities as a pretextual tactic in connection with the respondent's media camping. Plaintiff references that to prevail, one must establish a prima facie case; (1) she is a member of a protected class; (2) He suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 7 - Claim for Relief

### The Washington D.C. Human Rights Act – Credit Information - 2-1403.16

Plaintiff references that the Respondent continued to engage in additional means to subject the Plaintiff through its series of campaign and in direct violation of the Act by further subjecting the Plaintiff to professional and social harm through to exposure of the Plaintiff credit worthiness through Mass Media publication. Plaintiff references that to prevail, one must establish a prima facie case; (1) He is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives

rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

### Count 8 - Claim for Relief

#### The Washington D.C. Human Rights Act – Religion Beliefs 2-1403.16

Plaintiff references that the respondent engaged in willful and intentional discrimination against the Plaintiff by invading the Plaintiff privacy with-in the Plaintiff's place of residence and subjecting the Plaintiff to public radical and engaging in bigotry to mass audiences due to the Plaintiff beliefs and non-beliefs. Plaintiff references that to prevail, one must establish a prima facie case; (1) He is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

### Count 9 - Claim for Relief

#### The Washington D.C. Human Rights Act – Personal Appearance 2-1403.16

Plaintiff references that the respondent willfully engaged in discriminatory and humiliating and repulsive conduct in connection to the Plaintiff's personal appearance and through the intrusion of the Plaintiffs personal privacy. Plaintiff references that to prevail, one must establish a prima facie case; (1) He is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

### Count 10 - Claim for Relief

#### The Intentional Infliction to Cause Emotional Distress

Plaintiff references that the respondent engaged in intentional and reckless means to cause harm to the Plaintiff and his family through the unethical means of intrusion into the plaintiff's home and through the exposure of privileged communication with the intent to subject the Plaintiff to humiliation, radical, shame, in-decent exposure of private information and nudity. Plaintiff references that to prevail, one must

establish a prima facie case; (1) He is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 11 - Claim for Relief

### The Americans with Disabilities Act 1990 – Failure to Accommodate - 42 U.S.C 12101

Plaintiff continues by alleging that the respondent engaged in willful and intentional retaliation against the Plaintiff through the denial of the Plaintiff's medical accommodation request that was approved by the respondent's internal Registered Nurse and which that Plaintiff references cause no undue hardship to the Respondent. Plaintiff references that to prevail, one must establish a prima facie case; 1). The employee has a disability as defined by the ADA, 2). The employee informed the employer of his or her condition and requested an accommodation, 3). There was an accommodation available that would have been effective and would not have posed an undue hardship to the employer and 4). The employer failed to provide an accommodation. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 12- Claim for Relief

### Equal Pay Act 29 U.S.C. § 206(d)(1)

1.      Plaintiff references that the Enterprise engaged in direct discrimination against the Plaintiff in the course of hiring through willful compensation discrimination with the knowledge that the Plaintiff would be subject to similar alike work by employees of opposite sex, similar level of skill, significant portion of job task are similar and level experience. The differential in pay between male and female employees was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor was the difference in pay a result of a factor other than sex. Defendants caused, contributed to, or caused the continuation of wage rate discrimination based on sex, in violation of the Equal Pay Act. As a direct, legal and proximate result of the discrimination, Plaintiffs have sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiffs have suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other

compensation pursuant to 29 U.S.C. §216(b). Plaintiff references that to prevail, one must establish a prima facie case;1). Paid an employee of an opposite sex different wages, 2). For substantially equal work, 3). In job that require substantially equal skill, effort, and responsibility, 4). That are performed under similar working conditions. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 13 - Claim for Relief

**The Civil Rights Act of 1964 Title VII – Hostile Work Environment - 42 U.S.C. 2000e- 5(g)**

Plaintiff alleges that the respondent engaged in willful and intentional discriminatory conduct and through the ***"mixed motives theory"***, the Plaintiffs Race was a motivating factor in the Respondents conduct against the Plaintiff and the Plaintiff continues by references that by the preponderance of the evidence that the stated reason given by the respondent was pretextual as the Plaintiff was a member of a protected status. Plaintiff references that to prevail, one must establish a prima facie case; 1). Plaintiff continues by referencing that he belonged to a protected group; 2). He was subject to unwelcome harassment 3). The harassment was based on his membership in a protected group 4). The harassment was sufficiently pervasive to affect a term, condition, or privilege of employment. 5). The employer knew or should have known about the harassment but failed to take prompt, corrective action. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 14 - Claim for Relief

**Deformation 12-301 (4)**

Plaintiff references that the respondent willfully engaged intentional harm to the Plaintiffs reputation and professional statue by engaging in publishing communication pertaining the Plaintiff through Mass Media outlets in the attempt to preserve the respondent's reputation. Plaintiff continues that this communication was made via various outlets, hence subjecting the Plaintiff to radical, harm to the Plaintiffs charter, integrity, financial well-being, morality and moral turpitude (**i.e.** Radio, Motion Picture, Books, Social Media, Large & Public gathering). Plaintiff references that to prevail, one must establish a prima facie case; 1). The defendant made a false and defamatory statement concerning the plaintiff; 2). The defendant made an unprivileged publication to a third party; and 3). The publisher acted at least negligently in publishing the communication. Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. **Defendants' unlawful actions**

were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

## Count 15 - Claim for Relief

### The Washington D.C. Human Rights Act – Retaliation - 2-1403.16

Washington D.C. Law strictly prohibits discrimination and makes it unlawful for an employer to "take reprisals against any person because that person has opposed any practices or acts forbidden under this act" or to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected in this act." Plaintiffs made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices. Plaintiffs' complaints were made reasonably and in good faith. As a result of Plaintiffs' complaints, Defendants' agents and employees took adverse actions against Plaintiffs, including, but not limited to, issuing disciplinary warnings, such as; threats; reprimands by supervisors and agents policy aimed specifically at Plaintiff. As a direct, legal and proximate result of Defendants' reprisals, Plaintiffs have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. ; (1) He is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. **Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.**

## Count 15 - Claim for Relief

### Washington D.C. Deceptive and Unfair Trade Practices 28-3904

Plaintiff alleges that prior to accepting employment with the Respondent, Plaintiff was misled on the terms and conditions of the Respondent's diversity and inclusion program and how all employees would be treated fairly without non-inclusive work environment, encouraged by Leadership. Plaintiff continues be referencing that the Respondent engaged in false advertising of employment compensation and other terms and conditions of employment (**i.e.** Disciplinary Practices). Plaintiff continues by referencing that the unfair or deceptive practices caused the Plaintiff psychological, professional and social harm to the Plaintiff's reputation and future economic accomplishments as the conduct had a proximately caused actual injury to the Plaintiff. As a direct, legal and proximate result of Defendants' reprisals, Plaintiffs have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial (1) An unfair or deceptive act or practice; (2) In or affecting commerce; which (3) Proximately caused actual injury to the Plaintiff. **Plaintiff has sustained, and will continue to**

sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

### DECLARATORY RELIEF ALLEGATIONS

A present and actual controversy exists between Plaintiffs and Defendants concerning their rights and respective duties. Plaintiffs contend that Defendants violated their rights under *Civil Rights Act of 1964 Title VII*, *The Washington D.C Anti-Discrimination Provision*, *The Equal Pay Act*, *Unfair Trade Practices* and *The American with Disabilities Act 1990*. Plaintiffs are informed and believe and thereon allege that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate. Plaintiffs seek a judicial declaration of the rights and duties of the respective parties.

### INJUNCTIVE RELIEF ALLEGATIONS

No plain, adequate, or complete remedy at law is available to Plaintiffs to redress the wrongs addressed herein. If this Court does not grant the injunctive relief sought herein, Plaintiffs will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows: For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful; For reinstatement; For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful actions, in an amount to be proven at trial;

For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

For punitive damages in an amount to be determined at trial; For liquidated damages; For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation; For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

For reasonable attorneys' fees and costs of suit pursuant to all associated claims and for such other and further relief as this Court deems just and proper.

**Dated:  August 2, 2019**

Respectfully submitted,

By: _____

MOTANGA EBEN OBIA

E: Ome1938@aol.com

P: 443 248 5387

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all causes of action and claims to which they have a right to a jury trial.